[Cite as *State v. Furman*, 2023-Ohio-3019.]

# IN THE COURT OF APPEALS OF OHIO
## ELEVENTH APPELLATE DISTRICT
## ASHTABULA COUNTY

| | |
|---|---|
| STATE OF OHIO, | **CASE NO. 2022-A-0029** |
| Plaintiff-Appellee, | |
| - v - | Criminal Appeal from the Court of Common Pleas |
| JOHN FURMAN, | |
| Defendant-Appellant. | Trial Court No. 2020 CR 00577 |

**O P I N I O N**

Decided: August 28, 2023
Judgment: Affirm

*Colleen M. O'Toole*, Ashtabula County Prosecutor, and *Michael J. Bodyke*, Assistant Prosecutor, 25 West Jefferson Street, Jefferson OH 44047 (For Plaintiff-Appellee).

*Edward M. Heindel*, 2200 Terminal Tower, 50 Public Square, Cleveland, OH 44113 (For Defendant-Appellant).

EUGENE A. LUCCI, J.

{¶1} Appellant, John Furman, appeals his convictions for kidnapping, rape, and domestic violence following a jury trial. We affirm.

{¶2} In December 2020, Furman was indicted on the following charges resulting from allegations that on two separate dates he had kidnapped, assaulted, and raped his wife: (1) kidnapping, a first-degree felony, in violation of R.C. 2905.01(A)(4) and (C)(1), with a sexual motivation specification pursuant to R.C. 2941.147(A); (2) rape, a first-degree felony in violation of R.C. 2907.02(A)(2) and (B); (3) domestic violence, a third-degree felony, in violation of R.C. 2919.25(A); (4) kidnapping, a first-degree felony, in

violation of R.C. 2905.01(A)(4) and (C)(1), with a firearm specification pursuant to R.C 2941.145(A), and a sexual motivation specification pursuant to R.C. 2941.147(A); (5) rape, a first-degree felony, in violation of R.C. 2907.02(A)(2) and (B), with a firearm specification pursuant to R.C. 2941.145(A); and (6) domestic violence, a third-degree felony, in violation of R.C. 2919.25(A) and (D)(4), with a firearm specification pursuant to R.C. 2941.145(A). The first three of these charges pertained to incidents alleged to have occurred on or about October 23, 2020. The latter three charges pertained to incidents alleged to have occurred on or about October 29, 2020.

{¶3}  Following the filing of the indictment, the state moved for a competency evaluation. The issue of Furman's competency to stand trial was ongoing throughout much of the trial court's proceedings. On November 1, 2021, the trial court issued an entry deeming Furman competent to stand trial.

{¶4}  Prior to the competency determination, on September 16, 2021, Furman moved to dismiss, arguing that his speedy trial time had elapsed.[1] The state responded in opposition. Ultimately, the trial court overruled the motion.

{¶5}  The case proceeded to jury trial. The jury acquitted Furman on the first three charges, which pertained to the October 23, 2020 incidents. The jury found Furman guilty of the following with respect to the October 29, 2020 incidents: kidnapping and the attendant sexual motivation specification, rape, and domestic violence. The trial court referred Furman for a presentence investigation and report, ordered the parties to prepare sentencing briefs, and set the matter for sentencing.

---

1. In a magistrate's order issued following the arraignment, the magistrate noted that "A Time Waiver was executed by the Defendant." However, no time waiver appears in the record.

2

Case No. 2022-A-0029

{¶6} At sentencing, the trial court sentenced Furman to 10 years of imprisonment on the kidnapping count, a minimum of 10 years of imprisonment on the rape count, and 24 months of imprisonment on the domestic violence count. The court ordered the kidnapping and rape sentences to run consecutively and the domestic violence count to run concurrently, for a minimum aggregate prison term of 20 years to a maximum term of 25 years.

{¶7} In his first assigned error, Furman contends:

{¶8} "Furman was denied his constitutional and statutory rights to a speedy trial."

{¶9} "The right to a speedy trial is set forth in the Sixth Amendment to the United States Constitution and is obligatory on the states via the Fourteenth Amendment." *State v. Sitko*, 11th Dist. Trumbull No. 2020-T-0016, 2021-Ohio-788, ¶ 34, citing *State v. Broughton*, 62 Ohio St.3d 253, 256, 581 N.E.2d 541 (1991). "'Speedy-trial issues present mixed questions of law and fact.'" *Sitko* at ¶ 36, quoting *State v. Kist*, 173 Ohio App.3d 158, 2007-Ohio-4773, 877 N.E.2d 747, ¶ 18 (11th Dist.). "When reviewing a defendant's claim that he or she was denied the right to a speedy trial, we apply a de novo standard of review to questions of law and the clearly erroneous standard to questions of fact." *Sitko* at ¶ 36, citing *State v. Evans*, 11th Dist. Trumbull No. 2003-T-0132, 2005-Ohio-1787, ¶ 32.

{¶10} Pursuant to R.C. 2945.71(C)(2), a person charged with a felony must be brought to trial within 270 days of that person's arrest. For purposes of computing this time, each day that "the accused is held in jail in lieu of bail on the pending charge shall be counted as three days." R.C. 2945.71(E).

3

{¶11} R.C. 2945.72 extends the time that an accused must be brought to trial for the following periods:

(A) Any period during which the accused is unavailable for hearing or trial, by reason of other criminal proceedings against the accused, within or outside the state, by reason of confinement in another state, or by reason of the pendency of extradition proceedings, provided that the prosecution exercises reasonable diligence to secure availability of the accused;

(B) Any period during which the accused is mentally incompetent to stand trial or during which the accused's mental competence to stand trial is being determined, or any period during which the accused is physically incapable of standing trial;

(C) Any period of delay necessitated by the accused's lack of counsel, provided that such delay is not occasioned by any lack of diligence in providing counsel to an indigent accused upon the accused's request as required by law;

(D) Any period of delay occasioned by the neglect or improper act of the accused;

(E) Any period of delay necessitated by reason of a plea in bar or abatement, motion, proceeding, or action made or instituted by the accused;

(F) Any period of delay necessitated by a removal or change of venue pursuant to law;

(G) Any period during which trial is stayed pursuant to an express statutory requirement, or pursuant to an order of another court competent to issue such order;

(H) The period of any continuance granted on the accused's own motion, and the period of any reasonable continuance granted other than upon the accused's own motion;

(I) Any period during which an appeal filed pursuant to section 2945.67 of the Revised Code is pending;

(J) Any period during which an appeal or petition for a writ filed pursuant to section 2930.19 of the Revised Code is pending.

4

**{¶12}** Here, Furman maintains that he was arrested on November 17, 2020; however, the Ashtabula Municipal Court's entry issued prior to this matter being bound over to the grand jury indicates that Furman was arrested on October 30, 2020, and, on appeal, the state acknowledges that Furman was arrested on October 30, 2020. Thus, the speedy trial time commenced on October 31, 2020, the day after Furman's arrest. *See Evans*, 2005-Ohio-1787, at ¶ 33 (the day of the arrest is not counted in the speedy trial time). The record does not indicate that Furman posted bond to secure any pretrial release. "[F]or purposes of Ohio's speedy trial statute, a trial commences when voir dire begins." *State v. Knight*, 2d Dist. Greene No. 2003 CA 14, 2004-Ohio-1941, ¶ 10. The transcript indicates that voir dire commenced on February 14, 2022, long past the first 90 days Furman spent in pretrial confinement.

**{¶13}** However, the state maintains that several tolling events occurred which extended the speedy trial time. First, pursuant to R.C. 2945.72(E), speedy trial time was tolled commencing the day following defense counsel's motion to reduce bond on November 5, 2020. *State v. Toler*, 4th Dist. Ross No. 09CA3103, 2009-Ohio-6669, ¶ 19 ("[W]e do not include the date a motion was filed when calculating speedy trial time, unless that date also was the date the court entered an order resolving the motion."). Shortly thereafter, on November 12, 2020, the defense moved for a transcript, which continued the tolling period. The municipal court denied the motion to reduce bond on November 13, 2020; however, the tolling period continued until the transcript was completed, which the state maintains, and Furman does not dispute, occurred on December 14, 2020.

Case No. 2022-A-0029

**{¶14}** After the case was bound over to the trial court, Furman requested discovery and a bill of particulars on December 21, 2020, which the state supplied on December 29, 2020. Thus, speedy trial time was again tolled from December 22, 2020 through December 29, 2020, pursuant to R.C. 2945.72(E). *See State v. Rivera*, 11th Dist. Ashtabula No. 2011-A-0023, 2011-Ohio-6854, ¶ 20; and *State v. Brown*, 98 Ohio St.3d 121, 2002-Ohio-7040, 781 N.E.2d 159, ¶ 18 ("A demand for discovery or a bill of particulars is a tolling event pursuant to R.C. 2945.72(E).").

**{¶15}** Next, Furman's competency was questioned by the state through its motion filed on January 8, 2021. On January 15, 2021, the trial court ordered Forensic Psychiatric Center of Northeast Ohio, Inc. to conduct the evaluation and prepare a written statement. Thereafter, a hearing was held due to Furman's refusal to participate in the evaluation, eventually resulting in the trial court ordering competency to be determined through a 20-day inpatient evaluation. The evaluation determined that Furman was competent to stand trial, but, because Furman refused to stipulate to the report, the trial court set the matter for further hearing to allow the evaluating doctor to testify. After this hearing, the court found Furman competent to stand trial in a November 1, 2021 judgment entry.

**{¶16}** R.C. 2945.72(B) thus operated to toll the speedy trial time during the period "which [Furman's] mental competence to stand trial [was] being determined." In *State v. Palmer*, 84 Ohio St.3d 103, 106, 702 N.E.2d 72 (1998), paragraph one of the syllabus, the Ohio Supreme Court held that the tolling provision of R.C. 2945.72(B) commences from the date the accused files the motion to determine competency. Unlike *Palmer*, here, the state, not the accused, moved for a competency evaluation. Furman contends

6

that because he did not move for the evaluation, and he was competent to stand trial, the speedy trial time should not have been tolled. However, pursuant to R.C. 2945.72(B), speedy-trial time is tolled for "*[a]ny period* during which the accused is mentally incompetent to stand trial or during which his mental competence to stand trial is being determined[.]" (Emphasis added.) *See State v. Saunders*, 2022-Ohio-4739, 204 N.E.3d 1237, ¶ 22 (2d Dist.), citing *State v. Ridley*, 6th Dist. Lucas No. L-10-1314, 2013-Ohio-1268, ¶ 19, citing *State v. Patton*, 10th Dist. Franklin No. 08AP-800, 2009-Ohio-1382, ¶ 10 ("Although [the defendant] did not seek the competency evaluation, tolling nevertheless applied provided that the trial court did not abuse its discretion in sustaining the State's motion and ordering an evaluation."). While Furman maintains that the evaluation was unnecessary, he has not advanced an argument on appeal that the trial court abused its discretion in granting the state's motion to determine his competency.

{¶17} Accordingly, the speedy trial time was tolled from January 9, 2020 through November 1, 2021, when the court determined that Furman was competent to stand trial.

{¶18} Moreover, while Furman's competency was being evaluated, Furman moved to dismiss on speedy trial grounds on September 16, 2021. The trial court denied the motion on January 7, 2022. Accordingly, the speedy trial time was tolled pursuant to the motion to dismiss from September 17, 2021 through January 7, 2022.[2]

{¶19} Based on the foregoing, as of January 7, 2022, the following time periods were charged against the state for purposes of speedy trial time: October 31, 2020

---

2. In addition, defense counsel moved to continue the trial date due to medical reasons. However, as the parties have not argued that this period of continuance should be charged against Furman, and as it does not affect the outcome of this assigned error, we proceed to compute the trial time without regard to defense counsel's continuances.

Case No. 2022-A-0029

through November 5, 2020 (6 days or 18 jail days); December 15, 2020 through December 21, 2020 (7 days or 21 jail days); and December 30, 2020 through January 8, 2021 (10 days or 30 jail days). Accordingly, after denying the motion to dismiss on January 7, 2022, there remained 67 days to commence the trial while Furman remained in confinement. Trial thereafter commenced on February 11, 2022, well within the remaining time.

{¶20} Therefore, Furman's first assigned error lacks merit.

{¶21} In his second assigned error, Furman argues:

{¶22} "The trial court erred when [it] defined 'reasonable doubt' in a manner not consistent with the statutory definition."

{¶23} R.C. 2901.05(C) provides that "[a]s part of its charge to the jury in a criminal case, the court shall read the definitions of 'reasonable doubt' and 'proof beyond a reasonable doubt,' contained in division (E) of this section." R.C. 2901.05(E) provides:

> "Reasonable doubt" is present when the jurors, after they have carefully considered and compared all the evidence, cannot say they are firmly convinced of the truth of the charge. It is a doubt based on reason and common sense. Reasonable doubt is not mere possible doubt, because everything relating to human affairs or depending on moral evidence is open to some possible or imaginary doubt. "Proof beyond a reasonable doubt" is proof of such character that an ordinary person would be willing to rely and act upon it in the most important of the person's own affairs.

{¶24} "In a criminal case, where the trial court's charge to the jury amplifies upon the statutory definition of reasonable doubt, mandated by [former] R.C. 2945.04, the complained of amplification must be erroneous and prejudicial to the complaining party before the judgment of the trial court will be disturbed." *State v. Sargent*, 41 Ohio St.2d 85, 322 N.E.2d 634, 635 (1975), paragraph two of the syllabus.

8

Case No. 2022-A-0029

**{¶25}** Here, the trial court instructed the jury on "reasonable doubt" as follows:

> The legislature of the State of Ohio has defined the term reasonable doubt and that definition is as follows; reasonable doubt is present when jurors after they have carefully considered and compared all the evidence, cannot say they are firmly convinced of the truth of the charge. It is a doubt based on reason and common sense. Reasonable doubt is not a mere possible doubt, because everything relating to human affairs or depending on moral evidence is open to some possible or imaginary doubt.
>
> Proof beyond a reasonable doubt is proof of such character that an ordinary person would be willing to rely and act upon it in the most important of his own affairs. *You should not convict this defendant unless the evidence removes from your mind all reasonable doubt of his guilt. On the other hand, you should not acquit this defendant upon trivial suppositions.*

(Emphasis added.)

**{¶26}** On appeal, Furman challenges the last portion of the trial court's instruction, that the jury "should not acquit this defendant upon trivial suppositions." Furman maintains he was prejudiced by the addition of this phrase to the instruction because "[i]t is a phrase that has a tendency to make a conviction more likely."

**{¶27}** However, the defense did not object to the instruction. Therefore, Furman has forfeited all argument relative to this issue aside from plain error. "Crim.R. 52(B) affords appellate courts discretion to correct '[p]lain errors or defects affecting substantial rights notwithstanding the accused's failure to meet his obligation to bring those errors to the attention of the trial court." *State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, ¶ 22. "However, the accused bears the burden of proof to demonstrate plain error on the record, * * * and must show 'an error, i.e., a deviation from a legal rule' that constitutes 'an "obvious" defect in the trial proceedings[.]'" *Id.*, quoting *State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002). "[E]ven if the error is obvious, it must have

9

Case No. 2022-A-0029

affected substantial rights," meaning "'that the trial court's error must have affected the outcome of the trial.'" *Rogers* at ¶ 22, quoting *Barnes* at 27.

{¶28} This court has previously addressed an identically phrased addition to the instruction in the context of plain error. *State v. McMillen*, 11th Dist. Ashtabula No. 94-A-0050, 1995 WL 907889, *9 (Oct. 2, 1995). In *McMillen*, we relied on *State v. Jester*, 32 Ohio St.3d 147, 512 N.E.2d 962 (1987), and *State v. Manross*, 11th Dist. Ashtabula No. 1295, 1987 WL 14175 *8 (July 10, 1987). In *Jester* and *Manross*, the trial courts employed the "trivial supposition" language in the jury charge, but the appellants failed to demonstrate prejudice arising from the addition. Likewise, here, although Furman speculates that the jury may have been unaware of the meaning of "trivial supposition," such speculation does not in itself demonstrate the requisite prejudice. As we stated in *McMillen*, "[w]hile we agree that any amplification upon the definitions provided in R.C. 2901.05(D) is unnecessary and inadvisable, the amplification complained of in the instant case certainly does not constitute plain error." *McMillen* at *9, citing *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978).

{¶29} Accordingly, Furman's second assigned error lacks merit.

{¶30} In his third and fourth assigned errors, Furman maintains:

{¶31} "[3.] The convictions were against the manifest weight of the evidence."

{¶32} "[4.] There was insufficient evidence against Furman."

{¶33} The "[w]eight of the evidence concerns 'the inclination of the *greater amount of credible evidence* * * * to support one side of the issue rather than the other.'" (Emphasis sic.) *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), quoting Black's Law Dictionary 1594 (6th Ed.1990). When considering challenges to the

10

weight of the evidence, the appellate court reviews "'the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a ""thirteenth juror"" and disagrees with the factfinder's resolution of the conflicting testimony." *Thompkins* at 387, quoting *Tibbs v. Florida*, 457 U.S. 31, 42, 102 S.Ct. 2211, 2218, 72 L.Ed.2d 652 (1982). "The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *Thompkins* at 387, quoting *Martin* at 175.

{¶34} Unlike a manifest weight review, the question of whether sufficient evidence supports the conviction "is a test of adequacy," which we review de novo. *Thompkins* at 386*.* "In a sufficiency-of-the-evidence inquiry, the question is whether the evidence presented, when viewed in a light most favorable to the prosecution, would allow any rational trier of fact to find the essential elements of the crime beyond a reasonable doubt." *State v. Dent*, 163 Ohio St.3d 390, 2020-Ohio-6670, 170 N.E.3d 816, ¶ 15, citing *State v. Jenks*, 61 Ohio St.3d 259, 259-60, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶35} Thus, "[w]hen an appellant raises both sufficiency and manifest weight arguments in an appeal, the appellate court is only required to review the latter argument because "'a determination of whether a conviction is or is not supported by the weight of the evidence 'necessarily rests on the existence of sufficient evidence.'""

11

*State v. Fiederer*, 11th Dist. Lake No. 2019-L-142, 2020-Ohio-4953, ¶ 11, quoting *State v. DiBiase*, 11th Dist. Lake No. 2011-L-124, 2012-Ohio-6125, ¶ 38, quoting *State v. Pesec*, 11th Dist. Portage No. 2006-P-0084, 2007-Ohio-3846, ¶ 44.

**{¶36}** Here, as set forth in our recitation of the procedural history, the jury acquitted Furman of the first three charges pertaining to allegations related to October 23, 2020, but it found Furman guilty of the following charges related to his alleged actions on October 29, 2020: kidnapping, in violation of R.C. 2905.01(A)(4) and (C)(1), with a sexual motivation specification pursuant to R.C. 2941.147(A); rape, in violation of R.C. 2907.02(A)(2) and (B); and domestic violence, in violation of R.C. 2919.25(A) and (D)(4). Accordingly, we will focus our discussion on the evidence pertaining to the October 29, 2020 incidents, while addressing evidence pertaining to the alleged October 23, 2020 incident for background purposes.

**{¶37}** With respect to kidnapping, R.C. 2905.01(A)(4) provides:

> No person, by force, threat, or deception, or, in the case of a victim under the age of thirteen or mentally incompetent, by any means, shall remove another from the place where the other person is found or restrain the liberty of the other person * * * [t]o engage in sexual activity, as defined in section 2907.01 of the Revised Code, with the victim against the victim's will.

R.C. 2905.01(C)(1) generally classifies kidnapping as a first-degree felony. "Sexual motivation" for purposes of the R.C. 2941.147 specification, means that the offense was committed with "a purpose to gratify the sexual needs or desires of the offender." R.C. 2971.01(J).

**{¶38}** With respect to rape, R.C. 2907.02(A)(2) provides, "No person shall engage in sexual conduct with another when the offender purposely compels the other person to

12

submit by force or threat of force." R.C. 2907.02(B) generally classifies rape as a first-degree felony.

{¶39} With respect to domestic violence, R.C. 2919.25(A) provides, "No person shall knowingly cause or attempt to cause physical harm to a family or household member." R.C. 2919.25(D)(4) provides that, where the offender has previously been convicted of two or more offenses of domestic violence, a violation of R.C. 2919.25(A) is classified as a third-degree felony.

{¶40} In support of these charges, at trial, the state presented the testimony of the victim, the victim's mother, a sexual assault nurse examiner, a forensic scientist, and police officers.

{¶41} The victim testified that she and Furman had been married since November 2015, and they have three children together. In July 2020, the victim informed Furman that she wanted a divorce, and Furman refused to consent. Thereafter, the family moved into a home in Ashtabula County, Ohio. At that time, Furman was working as a tree trimmer in New York, where he would reside in motels during the week, and he would return home on Friday nights for the weekend. The victim was working night shifts at a casino approximately one hour from their home, and she would return home at approximately 3:30 a.m. each morning on Tuesday through Saturday. Due to their work and sleep schedules, the victim's mother would watch the children at her home overnight and return the children to the victim at 11:00 a.m.

{¶42} With respect to the Friday, October 23, 2020 allegations, the victim testified that she returned home from work at approximately 3:30 a.m. She heard a noise in the basement, and when she went to investigate, she located Furman on the basement stairs.

13

She was surprised Furman was there because he does not typically get home from work until Friday night, and she had not seen his car. Furman approached her and drew a knife. He then held the blade to the victim's face and stated that the victim would not be cheating on him so much if her "pretty little face [was] all scarred up." Furman then instructed her to go the basement and masturbate in front of him. After that, she and Furman went to the kitchen, and the victim made coffee and the two spoke for some time. Eventually, they went to the bedroom and had intercourse. The victim indicated that Furman had his knife in his possession the entire time, and, although she was not "in the mood" to have intercourse with Furman, she "didn't fight him off or anything." The victim indicated that, at the time of this incident, their marriage was "[v]ery rocky[.]" The next day, Furman agreed to a divorce if they had one more family day with the children, and they proceeded to take the children to a pumpkin patch. The victim and Furman agreed that Furman should seek medical care for his aberrant behavior. On cross-examination, the victim affirmed that she had testified in another proceeding that she voluntarily had sex with Furman during the weekend following the October 23 incident. She also acknowledged that, following that incident, Furman stayed at their home.

{¶43} The victim and the victim's mother testified that they discussed the October 23, 2020 incident. Due to their concerns for the victim's safety, they decided that, in case the victim felt herself to be in danger thereafter, she would send a text message to her mother asking if she had any "weed" as a code that she needed assistance.

{¶44} With respect to the Thursday, October 29, 2020 allegations, the victim testified that she came home from work and fell asleep on the couch. She was awoken by Furman flipping her off the couch. When she got up from the floor, Furman hit her on

14

the left side of her face, and she fell back down. The victim began to scream, and Furman covered her mouth with his hand. Furman informed her that he was going to kill himself, and he wanted her to tell their children that their dad had died because their mom was "a whore." Furman then hit her twice more, asking where her gun was. She informed him that it was above the refrigerator. Furman then retrieved the gun and cocked it. He held it to his head, and then to the victim's head. Thereafter, he forced vaginal intercourse with the victim, and demanded she call out the name of the man with whom Furman believed she was cheating. For about four hours Furman attempted to make the victim confess that she was cheating on him, and, when she would not, he would strike her. During this time, Furman also dumped coffee on the victim and chased her around their dining table. As it approached the time when the victim's mother would normally return the children, Furman instructed the victim to text her mother and tell her not to bring the children home and, instead, the victim would pick them up. The victim texted her mother saying she would pick up the children, followed by, "do you have any reefer[?]" The victim indicated that Furman knew that the reference to marijuana was code, and he struck her again. The victim suggested they leave the house because she thought it would be safer if she were not alone in the home with him. Furman agreed and led the victim to the victim's car and directed her through the driver's side into the passenger seat. The victim did not see Furman's car anywhere. Furman and the victim then drove to Pennsylvania. Furman continued to have possession of the gun, and he continued to threaten to kill himself.

{¶45} The victim's mother testified that on the morning of October 29, 2020, she took the children to get lunch and then drove them home. When they arrived, the garage

15

door was open, which was unusual, and the victim's car was gone. The victim's mother was concerned due to the discussion she had with the victim regarding the October 23, 2020 incident. Accordingly, she told the victim's children to wait in the car, and she then began to look for the victim. Inside the home, she heard the victim's phone ringing in the garbage can in the kitchen. The house was in disarray, and coffee had been spilled and chairs knocked over. The victim's mother called the police and notified them of her suspicions that Furman had abducted the victim. When the police arrived, the victim's mother checked her own phone to verify the victim's last contact with her, and at that point, she saw that the victim had sent her their agreed distress code.

{¶46} An officer from the Ashtabula City Police Department testified that he was dispatched to the victim's home on October 29, 2022 to meet with the victim's mother, who believed the victim to be missing. After speaking with the victim's mother, officers entered the victim's residence and noticed that coffee had been spilled on the floor, and an ashtray and chair were overturned in the dining room. Because it appeared that an altercation had occurred, the officer notified a detective.

{¶47} A detective who arrived at the scene was briefed by responding officers and spoke to the victim's mother. Based upon information received from the victim's mother, the detective confirmed that a cell phone located in the home belonged to the victim and a cell phone located in the back yard belonged to Furman. Officers then began to search for the two cars owned by the victim and Furman.

{¶48} Another detective testified that he located Furman's car at a funeral home down the road from the victim's house. Officers then arranged for the car to be towed to the police station.

16

Case No. 2022-A-0029

{¶49} Meanwhile, the victim testified that she and Furman continued driving for several hours in Pennsylvania. Eventually, Furman agreed to return to get his car, to let the victim take her car home, and to go their separate ways. However, when they went to retrieve Furman's car from the funeral home, it had been towed. Realizing that the police may now be involved, Furman agreed to drive the victim near to her mother's house and drop her off. He told the victim that he planned to wait for an officer to get behind him and commit suicide via police. The victim kissed Furman goodbye on his lips, wished him good luck, and gave him all of the money in her wallet. The victim then walked to her mother's house, and Furman drove away. After arriving at her mother's house, the police were notified of her return.

{¶50} On cross-examination, the victim indicated that, during the October 29 incident, she did drive the car during portions of the day. She further verified that they did makes stops at a gas station for fuel and along the road to urinate. However, she did not attempt to flee. The victim indicated that she uses marijuana daily, usually four times per day, and she had been diagnosed as bipolar in 2018, but does not use the prescribed medication.

{¶51} The state further elicited testimony regarding the victim's injuries. The victim's mother testified that when the victim returned to her house, she was shaking and bruised, and her voice was cracking. Thereafter, the victim went to the police station and was interviewed. The detective who interviewed the victim testified that she had visible trauma to the left side of her face, her neck, and her lower forearm. The victim was then transported to the hospital, where the detective photographed the victim's injuries.

{¶52} A sexual assault nurse examiner testified that she performed an examination and administered a rape kit on the victim. The nurse indicated that the victim had bruising behind her ear, under her chin, and on the left side of her face from under the chin to her hairline. The victim also had lacerations on her foot. There was no injury noted from the pelvic examination, but the nurse indicated that it is not unusual for women to not experience injury to the pelvic area from a sexual assault after puberty. A forensic scientist that tested the swabs from the rape kit testified that some of the swabs indicated the presence of semen.

{¶53} The state provided several pictures of the scene and the victim that were identified through the above witnesses. The state further offered certified copies of two prior convictions of Furman for domestic violence, and these convictions were admitted into evidence without objection.

{¶54} On appeal, Furman contends that the victim was not credible, and no reasonable jury could believe her testimony. In support, Furman references the victim's behavior prior to leaving the car on October 29, 2020, when she kissed Furman goodbye, gave him money, and wished him well. Further, Furman points to the victim's acknowledgment to having consensual sex with Furman following the alleged October 23, 2020 incident as well as her other statements made on cross-examination as demonstrating her lack of credibility.

{¶55} Although the victim's behavior to which she testified may not be typical or expected, the jury was in a superior position than this court to assess her credibility. *See State v. Fiederer*, 11th Dist. Lake No. 2019-L-142, 2020-Ohio-4953, ¶ 13. The victim testified that Furman repeatedly assaulted her, pointed a gun at her, and forced vaginal

18

intercourse with her on October 29, 2020. The victim's behavior is not so unusual that we can say that this is the exceptional case where the evidence weighs heavily against Furman's convictions. Accordingly, the convictions are not against the weight of the evidence and are supported by sufficient evidence.

**{¶56}** Therefore, Furman's third and fourth assigned errors lack merit.

**{¶57}** In his fifth assigned error, Furman contends:

**{¶58}** "Furman was denied his right to the effective assistance of counsel in violation of the Sixth Amendment and Article I, Section 10 of the Ohio Constitution."

**{¶59}** To prevail on a claim of ineffective assistance of counsel, "a defendant must prove that counsel's performance was deficient and that the defendant was prejudiced by counsel's deficient performance." *State v. Davis*, 159 Ohio St.3d 31, 2020-Ohio-309, 146 N.E.3d 560, ¶ 10, citing *State v. Bradley*, 42 Ohio St.3d 136, 141-142, 538 N.E.2d 373 (1989); and *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). "Thus, the defendant must demonstrate that counsel's performance fell below an objective standard of reasonableness and that there exists a reasonable probability that, but for counsel's error, the result of the proceeding would have been different." *Davis* at ¶ 10, citing *Bradley* at paragraphs two and three of the syllabus.

**{¶60}** Furman first argues that counsel was ineffective for failing to move for immediate discharge based on speedy trial grounds. However, as set forth in our recitation of the procedural history as well as our discussion of the first assigned error, counsel did move to dismiss the indictment on speedy trial grounds. To the extent that Furman maintains that such a motion should have been later renewed, as set forth in our

19

discussion of the first assigned error, there existed no speedy trial violation. Accordingly, defense counsel was not ineffective on this basis.

{¶61} Furman next argues that counsel was ineffective for failing to object to the trial court's definition of reasonable doubt. However, as set forth in our discussion of Furman's second assigned error, he has not established prejudice resulting from the trial court's instruction. Furman's fifth assigned error likewise fails to establish prejudice resulting from counsel's failure to object to the court's instruction. *See State v. Walker*, 11th Dist. Lake No. 2022-L-077, 2023-Ohio-1949, ¶ 33, citing *Rogers* at ¶ 22 ("both plain error and ineffective assistance of counsel claims require a showing of an error and that there exists a reasonable probability that the error affected the outcome of trial").

{¶62} Accordingly, Furman's fifth assigned error lacks merit.

{¶63} Having found no merit to Furman's assigned errors, the judgment is affirmed.


JOHN J. EKLUND, P.J.,

MARY JANE TRAPP, J.,

concur.

20